## PARCC, INC. *v.* COMMISSION ON HOSPITALS AND HEALTH CARE
## (15100)

Peters, C. J., and Callahan, Borden, Berdon and Palmer, Js.

Argued May 30—decision released August 15, 1995

*Mark R. Kravitz*, with whom were *Maureen Weaver, Eric P. Neff* and, on the brief, *R. Jeffrey Sands*, for the appellant (plaintiff).

*Jane S. Scholl*, associate attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (defendant).

BORDEN, J. The dispositive issue in this appeal is whether the denial by the defendant, the commission on hospitals and health care, of the request by the plaintiff, PARCC, Inc., for reauthorization of the construction of a planned ten bed expansion of its nursing home facility (facility), was a final decision of an administrative agency in a contested case under the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. The plaintiff appeals[1] from the trial court's

---

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

dismissal of its appeal from the defendant's denial of reauthorization. The trial court determined that the defendant's decision was not a final decision in a contested case, and, therefore, was not appealable. The plaintiff claims that the defendant's denial of its request for reauthorization constituted the revocation of a license, as that term is defined in the UAPA. The plaintiff further contends that the revocation of a license is, again by statutory definition in the UAPA, a final decision of an agency in a contested case. Accordingly, the plaintiff claims that the trial court improperly granted the defendant's motion to dismiss. We agree, and we therefore reverse the judgment of the trial court.

The following facts and procedural history are undisputed. Prior to July 1, 1989, any health care facility that sought to increase its capacity[2] was required first to apply to the defendant for a certificate of need. The governing statute authorized the defendant to consider such an application by "ascertaining the availability of such service or function at other inpatient rehabilitation facilities, health care facilities or institutions or state health care facilities or institutions within the area to be served, the need for such service or function within such area and any other factors which the commission deems relevant to a determination of whether the facility or institution is justified in introducing such additional functions or services into its program or increasing its staff . . . ." General Statutes (Rev. to 1989) § 19a-154. If the defendant determined that the proposed expansion would fulfill a demonstrated public need, it would issue a certificate of need. Thereafter, the facility was required to apply for final licensure from the state department of public health and addiction services (health and addiction services). Final licensure

---

[2] The capacity of health care facilities is determined according to the number of beds therein.

by health and addiction services would not be issued "except upon application for, receipt of, and compliance with all limitations and conditions required by the [defendant] in accordance with Connecticut General Statutes, sections [19a-147 through 19a-155,] inclusive." Regs., Conn. State Agencies § 19-13-D8t (b) (1). No facility could operate the expanded portion of the facility until it had obtained final licensure from health and addiction services.

In 1989, the legislature enacted legislation permitting nursing homes participating in Medicaid (Title XIX) or Medicare (Title XVIII) "on a one-time basis, [to] increase [their] licensed bed capacity and implement a capital construction project to accomplish such an increase without being required to request or obtain approval of the increase in services, licensed bed capacity or the capital expenditures program from the commission on hospitals and health care provided that the project (1) shall not require licensure by the department of health services of more than ten additional nursing home beds and (2) the total capital cost of said program shall not exceed thirty thousand dollars per bed, adjusted for inflation annually by said commission." Public Acts 1989, No. 89-325, § 3 (P.A. 89-325), effective July 1, 1989, codified at General Statutes (Rev. to 1991) § 19a-155a, now General Statutes § 17b-351.

In December, 1990, the plaintiff, a licensed skilled nursing facility with a capacity of approximately 130 beds, notified the defendant that it intended to add ten beds to its facility at a cost of no greater than $300,000 pursuant to P.A. 89-325, § 3. The defendant acknowledged receipt of the plaintiff's request in January, 1991. The defendant's letter to the plaintiff stated: "This is to acknowledge receipt of your letter dated December 6, 1990, in which you indicated that, pursuant to Section 3 of Public Act 89-325, you plan to add ten (10) nursing home beds . . . at a total capital cost not to exceed

$300,000. You also indicated that your facility currently participates in the Title XVIII and Title XIX programs and has not previously increased the number of beds at the facility pursuant to Section 3 of Public Act 89-325. Please be advised the [defendant] has reviewed your request and found that it is in compliance with the stipulations of Section 3 of Public Act 89-325. Therefore, it will not be necessary for you to obtain further permission from [the defendant] for you to proceed with your plans to add ten (10) nursing home beds . . . . Thank you for letting [the defendant] know of your plans."

The plaintiff's proposed addition of ten beds was to occur in two phases. Phase I involved the temporary addition of three beds to existing double occupancy rooms. Phase II would involve substantial renovations to the second floor of the facility, the addition of ten beds to the renovated section, and the removal of the three temporary beds. On May 4, 1992, health and addiction services approved the site construction plans for phase I of the project. On May 29, 1992, health and addiction services granted final licensure to the plaintiff for phase I of the project.

On February 24, 1993, the plaintiff submitted preliminary architectural plans and drawings for phase II to health and addiction services. That agency acknowledged receipt of the plans two days later, stating that the preliminary plans were acceptable, but not sufficiently specific to permit final review. Health and addiction services requested that more detailed plans be submitted and noted "the receipt of a letter dated January 3, 1991, issued by [the defendant] advising [the plaintiff] that it was found in compliance with the provisions of PA 89-325, Section 3, allowing the addition of ten (10) beds to the facility without further commission approval."

On June 29, 1993, No. 93-406, § 2, of the 1993 Public Acts[3] (P.A. 93-406) became effective. This act provided that, due to insufficient need for all of the nursing home beds that had been permitted pursuant to § 19a-155a, any nursing facility that had not submitted plans to

[3] Number 93-406, § 2, of the 1993 Public Acts provides: "Section 19a-155a of the general statutes is repealed and the following is substituted in lieu thereof:

"(a) Notwithstanding the provisions of sections 19a-154 and 19a-155, any nursing home participating in the Title XVIII and Title XIX programs may, on a one-time basis, increase its licensed bed capacity and implement a capital construction project to accomplish such an increase without being required to request or obtain approval of the increase in services, licensed bed capacity or the capital expenditures program from the commission on hospitals and health care provided that the project (1) shall not require licensure by the department of health services of more than ten additional nursing home beds and (2) the total capital cost of said program shall not exceed thirty thousand dollars per bed, adjusted for inflation annually by said commission.

"(b) The general assembly finds evidence of insufficient need for all the nursing home beds permitted pursuant to subsection (a) of this section, but not licensed by the department of health services and finds allowing unnecessary beds to be licensed will result in severely damaging economic consequences to the state and to consumers. An addition of beds initiated pursuant to this section shall be licensed no later than June 9, 1993. *A facility which has initiated the addition of beds but has not obtained licensure of such beds, may, no later than July 15, 1993, apply to the commission on hospitals and health care for authorization to proceed with completion of the additional beds and application for licensure, provided (A) plans for the additional beds have been approved by the department of health services pursuant to section 19-13-D-8t (v) (4) of the public health code no later than June 1, 1993, and (B) twenty-five per cent of estimated project costs have been expended no later than June 9, 1993, provided project costs may not exceed thirty-one thousand two hundred eleven dollars per bed.* The commission shall issue a decision on such application within forty-five days of receipt of documentation necessary to determine expended project costs. Evidence of project costs expended shall be submitted in the form of a report prepared by a certified public accountant having no affiliation with the owner of the facility or the developer of the project. The owner of a facility, for which completion of additional beds is not so authorized, may apply to the commissioner of income maintenance for compensation on or after the effective date of this act, but no later than September 1, 1993, provided plans for the additional beds have been approved by the department of health services no later than June 1, 1993 Such compensation shall be limited to actual verifiable losses which directly result from the

health and addiction services on or before June 1, 1993, and had not expended at least 25 percent of the project costs, could no longer proceed with its planned additions.

The plaintiff claims that it had submitted its plans and drawings for final approval by health and addiction services on April 23, 1992. Thereafter, health and addiction services informed the plaintiff that it had not received the architectural plans.[4] In response to this notification, the plaintiff submitted a copy of the architectural plans on June 25, 1993. On July 8, 1993, health and addiction services issued a letter to the plaintiff indicating that certain changes were required before it would grant final approval. The next day, however, health and addiction services informed the plaintiff that because of the passage of P.A. 93-406, "plans for the [plaintiff's] project [were] required to have been approved by this department no later than June 1, 1993. We, therefore, are not permitted to continue the design review of your project unless it has been reauthorized to continue by the [defendant]."

On July 15, 1993, the plaintiff applied to the defendant for reauthorization pursuant to the requirements of P.A. 93-406. The plaintiff stated that "the total project cost associated with the 10-bed addition will approximate

failure to gain authorization pursuant to this subsection and which cannot be otherwise recouped through the mitigating efforts of the owner, excluding consequential and incidental losses such as lost profits. In no event may such compensation exceed project costs. An owner aggrieved by the amount of compensation determined by the commissioner may request a hearing in accordance with the provisions of sections 17-2a and 17-2b. This subsection shall not apply to any addition of beds pursuant to this section which is part of a construction project that also includes an addition of beds authorized pursuant to subdivision (4) of subsection (k) of section 19a-154, as amended by section 1 of this act." (Emphasis added.)

[4] The defendant contends that health and addiction services has no record of this submission. The plaintiff claims that the submission was lost through the misfeasance of health and addiction services. Because we conclude that the plaintiff was entitled to a hearing, we do not address this factual dispute.

$227,249. The listing of project costs incurred . . . as of June 9, 1993, totaled $56,076 . . . ." The defendant delegated to the department of social services the responsibility for making a preliminary determination as to whether the plaintiff was eligible for reauthorization. The department of social services reviewed the plaintiff's application and determined that, because the phase II plans had not been approved by health and addiction services prior to June 1, 1993, as required by P.A. 93-406, the plaintiff was not authorized to proceed with completion of the addition of ten beds. The department of social services also concluded that "there [was] no basis to waive the statutory requirement" that the plans be approved by health and addiction services prior to June 1, 1993, because there was "no evidence that the phase II plans were submitted to [health and addiction services] in April, 1993." On November 18, 1993, the defendant, without affording the plaintiff an opportunity for a hearing, accepted the recommendation of the department of social services and denied the plaintiff's application for reauthorization of phase II of its project.

On December 3, 1993, the plaintiff submitted to the defendant a request for reconsideration of its denial of the plaintiff's application for reauthorization. The defendant did not reply to the reconsideration request and, accordingly, it was deemed denied on December 28, 1993. See General Statutes § 4-181a.[5] The plaintiff

[5] General Statutes § 4-181a provides: "Contested cases. Reconsideration. Modification. (a) (1) Unless otherwise provided by law, a party in a contested case may, within fifteen days after the personal delivery or mailing of the final decision, file with the agency a petition for reconsideration of the decision on the ground that: (A) An error of fact or law should be corrected; (B) new evidence has been discovered which materially affects the merits of the case and which for good reasons was not presented in the agency proceeding; or (C) other good cause for reconsideration has been shown. Within twenty-five days of the filing of the petition, the agency shall decide whether to reconsider the final decision. *The failure of the agency to make that determination within twenty-five days of such filing shall constitute a denial of*

thereafter appealed from the decision of the defendant to the trial court pursuant to General Statutes §§ 4-183 (c) and 19a-158,[6] claiming that the defendant's refusal to grant the plaintiff's application for reauthorization of phase II was improper because the defendant had

*the petition.* (2) Within forty days of the personal delivery or mailing of the final decision, the agency, regardless of whether a petition for reconsideration has been filed, may decide to reconsider the final decision. (3) If the agency decides to reconsider a final decision, pursuant to subdivision (1) or (2) of this subsection, the agency shall proceed in a reasonable time to conduct such additional proceedings as may be necessary to render a decision modifying, affirming, or reversing the final decision.

"(b) On a showing of changed conditions, the agency may reverse or modify the final decision, at any time, at the request of any person or on the agency's own motion. The procedure set forth in this chapter for contested cases shall be applicable to any proceeding in which such reversal or modification of any final decision is to be considered. The party or parties who were the subject of the original final decision, or their successors, if known, and intervenors in the original contested case, shall be notified of the proceeding and shall be given the opportunity to participate in the proceeding. Any decision to reverse or modify a final decision shall make provision for the rights or privileges of any person who has been shown to have relied on such final decision.

"(c) The agency may, without further proceedings, modify a final decision to correct any clerical error. A person may appeal that modification under the provisions of section 4-183 or, if an appeal is pending when the modification is made, may amend the appeal." (Emphasis added.)

[6] General Statutes § 4-183 (c) provides: "Within forty-five days after mailing of the final decision under section 4-180 or, if there is no mailing, within forty-five days after personal delivery of the final decision under said section, a person appealing as provided in this section shall serve a copy of the appeal on the agency that rendered the final decision at its office or at the office of the attorney general in Hartford and file the appeal with the clerk of the superior court for the judicial district of Hartford-New Britain or for the judicial district wherein the person appealing resides or, if that person is not a resident of this state, with the clerk of the court for the judicial district of Hartford-New Britain. Within that time, the person appealing shall also serve a copy of the appeal on each party listed in the final decision at the address shown in the decision, provided failure to make such service within forty-five days on parties other than the agency that rendered the final decision shall not deprive the court of jurisdiction over the appeal. Service of the appeal shall be made by (1) United States mail, certified or registered, postage prepaid, return receipt requested, without the use of a sheriff or other officer, or (2) personal service by a proper officer or indifferent person making service in the same manner as complaints are served in ordinary civil actions."

General Statutes § 19a-158 provides: "Appeals. Any health care facility or institution and any state health care facility or institution aggrieved by any

not afforded the plaintiff notice and a hearing. The defendant moved to dismiss the appeal on the ground that the plaintiff had not appealed from a final decision of an agency in a contested case as required by the UAPA. The trial court granted the motion, and rendered judgment dismissing the administrative appeal. This appeal followed.

The trial court concluded that "[n]either General Statutes § 19a-155a nor Public Act 93-406 requires the defendant to provide a hearing to determine if the applicant is entitled to proceed with licensure of a ten-bed addition." The trial court also concluded that, although the plaintiff had the legal right to seek approval to pursue licensure of phase II of its planned expansion, because "the [defendant] is not required by statute to provide an opportunity for a hearing to determine the plaintiff's legal right to pursue licensure of the ten-bed addition, the present case is not a contested case within the meaning of the UAPA. Therefore [because] the present case is not a contested case, the [defendant's] decision to deny the plaintiff's application for an exception to Public Act 93-406 was not a final decision from which the plaintiff had a right to appeal pursuant to General Statutes § 4-183 (a)."[7]

The plaintiff claims that the trial court improperly granted the defendant's motion to dismiss because the

final decision of said commission under the provisions of sections 19a-145 to 19a-156, inclusive, or section 19a-167e or 19a-167g, may appeal therefrom in accordance with the provisions of section 4-183, except venue shall be in the judicial district in which it is located. Such appeal shall have precedence in respect to order of trial over all other cases except writs of habeas corpus, actions brought by or on behalf of the state, including informations on the relation of private individuals, and appeals from awards or decisions of workers' compensation commissioners."

[7] General Statutes § 4-183 (a) provides: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal."

plaintiff's administrative appeal was from the final decision of an agency in a contested case. The plaintiff contends that because the defendant was required by the UAPA to conduct a hearing before denying the plaintiff's application for reauthorization, the trial court improperly dismissed its appeal. In support of this claim, the plaintiff argues that the defendant had granted it a license, as defined in § 4-166 (6)[8] of the UAPA, to proceed with construction of the ten bed addition to the facility. The plaintiff further argues that when the defendant denied the plaintiff's application, the denial constituted a revocation of that license, and that § 4-182 (c)[9] requires notice and an opportunity for a hearing before such a revocation. We agree.

"Judicial review of an administrative decision is a creature of statute." *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, 226 Conn. 792, 799, 629 A.2d 367 (1993). Section 4-183 (a) of the UAPA provides in part that "[a] person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. . . ." A "contested case" is defined in § 4-166 (2) as "a proceeding . . . in which the legal rights, duties or privileges of a party are required by statute

---

[8] General Statutes § 4-166 (6) provides: " 'License' includes the whole or part of any agency permit, certificate, approval, registration, charter or similar form of permission required by law, but does not include a license required solely for revenue purposes."

[9] General Statutes § 4-182 (c) provides: "No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. If the agency finds that public health, safety or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined."

to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held . . . ."

The issue in this case is whether the defendant was statutorily required to conduct a hearing. To make that determination, we "examine all the statutory provisions that govern the activities of the particular agency . . . in question." (Internal quotation marks omitted.) *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 802–803.

The trial court correctly concluded that the terms of § 19a-155a and P.A. 93-406 did not require the defendant to provide an opportunity for a hearing. We conclude, however, that the trial court improperly limited its focus to those two statutes. In addition to being governed by chapter 368c of the General Statutes, § 19a-145 et seq., the defendant is governed by the UAPA. Accordingly, if the UAPA required the defendant to conduct a hearing before denying the plaintiff's application, then the defendant had a statutory duty to conduct a hearing.

The UAPA states that "[n]o revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice . . . to the licensee . . . and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. . . ." General Statutes § 4-182 (c). Thus, if, as the plaintiff argues, the defendant's denial of the plaintiff's request for reauthorization was the revocation of a license, as defined by the UAPA, then the defendant had a statutory duty to conduct a hearing before denying that request.

First we must determine, therefore, whether the plaintiff had a license within the meaning of the UAPA. A license is defined in § 4-166 (6) of the UAPA as "the whole or part of any agency permit, certificate,

approval, registration, charter or similar form of permission required by law . . . ." We have construed this language broadly to include any required agency permission even if it is not specifically called a "license." See, e.g., *Easter House, Inc.* v. *Dept. of Children & Youth Services*, 214 Conn. 560, 573 A.2d 304 (1990). The plaintiff's claim, therefore, turns upon whether the defendant's initial permission to proceed with the ten bed expansion was required by law.

The statutory framework that created and governs the defendant provides that agency with virtually plenary authority over the creation and expansion of nursing care facilities such as that operated by the plaintiff. "The [defendant] was created by the legislature to ensure the efficient utilization of health care resources and to control the burgeoning costs of health care. *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 200 Conn. 489, 497, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986). To achieve those ends, the legislature granted the [defendant] broad powers over the budgets of hospitals and over the initiation of new programs and capital expenditures by health care institutions. Id., 497–98; see General Statutes §§ 19a-150, 19a-151, 19a-153 (a), 19a-154 (a), 19a-156 (a)." *Commission on Hospitals & Health Care* v. *Stamford Hospital*, 208 Conn. 663, 667–68, 546 A.2d 257 (1988).

The plain language of § 19a-155a includes requirements beyond that of determination of need. This statute requires a determination of whether the facility requesting expansion: (1) constitutes a "nursing home"; (2) participates in Title XVIII and Title XIX programs; (3) has not previously increased its capacity pursuant to § 19a-155a; (4) is not planning an expansion of more than ten beds; and (5) costs no more than $30,000 per bed. It would be inconsistent with the plain language of the statute, therefore, to conclude that the legislature

intended to authorize nursing facilities completely to circumvent the defendant in expanding their capacity. We conclude that, despite the legislative provision allowing the plaintiff to bypass obtaining a certificate of need, the plaintiff nonetheless was required by law to obtain approval from the defendant in other respects before proceeding with the planned expansion of the facility.

Moreover, our conclusion accords with the administrative scheme within which the plaintiff, the defendant and health and addiction services in fact operated. In advance of proceeding with its planned expansion, the plaintiff sought the approval of the defendant. The defendant thereafter granted that approval in a letter stating that it had *"reviewed [the plaintiff's] request and found that it is in compliance with the stipulations of Section 3 of Public Act 89-325.* Therefore, it [would] not be necessary for [the plaintiff] to obtain *further permission* from [the defendant] . . . to proceed with [its] plans to add ten (10) nursing home beds . . . ."* (Emphasis added.) Thereafter, in reviewing both phase I and phase II of the plaintiff's plans, health and addiction services acknowledged receipt of a copy of the defendant's letter to the plaintiff. Indeed, health and addiction services requires such permission in advance of granting final approval of a health care facility's expansion. "A facility shall not be constructed, expanded or licensed to operate except upon application for, receipt of, and compliance with *all limitations and conditions* required by the [defendant] in accordance with Connecticut General Statutes, sections [19a-147 to 19a-155,] inclusive." (Emphasis added.) Regs., Conn. State Agencies § 19-13-D8t (b) (1).

"We presume that laws are enacted in view of existing relevant statutes and that the legislature intended them to be read together so as to constitute one consistent body of law. *Department of Administrative Services*

v. *Employees' Review Board*, 226 Conn. 670, 679, 628 A.2d 957 (1993)." *Pollio* v. *Planning Commission*, 232 Conn. 44, 55, 652 A.2d 1026 (1995). Accordingly, we conclude that the legislature intended § 19a-155a to be interpreted in light of the established administrative scheme governing the expansion of nursing care facilities. In the context of the statutory and regulatory system that governs such expansion, we are persuaded that, in enacting § 19a-155a, the legislature intended to modify the criteria that the defendant would use in reviewing the plaintiff's request, but did not intend to abrogate entirely the defendant's "broad powers over the budgets of hospitals and over the initiation of new programs and capital expenditures by health care institutions." *Commission on Hospitals & Health Care* v. *Stamford Hospital*, supra, 208 Conn. 668.

Because the plaintiff was required by statute to obtain the defendant's permission to proceed with its planned ten bed expansion, we conclude that such permission constituted a license. The defendant, therefore, was required by the UAPA to afford the plaintiff notice and an opportunity for a hearing before such license was revoked.

The defendant argues that the requirements of the UAPA regarding licenses and their revocation are inapposite to this case because "[§ 19a-155a] itself, not the [defendant] through a licensing process, gave the plaintiff the authority to increase its bed capacity. . . . Thus the eligibility possessed by the plaintiff to add ten beds was not a license within the meaning of [§ 4-166 (6)]." The defendant correctly points out that the General Assembly is specifically excluded from the definition of "agency" within the UAPA. General Statutes § 4-166 (1). The gravamen of the defendant's argument is that the plaintiff had been granted permission to proceed with the ten bed expansion of the facility directly by the legislature, and, therefore, that the "license" that

the plaintiff obtained was not "agency" permission. Thus, the defendant argues, the UAPA is inapplicable to this case.

The plaintiff argues, to the contrary, that § 19a-155a did not abrogate the defendant's authority to oversee expansion of health care facilities, but instead, changed the statutory criteria that the defendant was to consider in granting permission to expand the plaintiff's bed capacity. We agree with the plaintiff. As we have held, earlier in this opinion, although § 19a-155a eliminated the requirement that the plaintiff obtain the defendant's approval of the "increase in services, licensed bed capacity or the capital expenditure program," it did not thereby abrogate entirely the defendant's oversight authority.

The defendant also argues that even if its letter acknowledging that the plaintiff had met the statutory requirements to proceed with its ten bed expansion constituted a license, the revocation of that permission was accomplished by the legislature rather than the defendant. The defendant contends that P.A. 93-406[10] in effect already had revoked the plaintiff's license when the defendant denied the plaintiff's application for reauthorization because the plaintiff had not obtained final licensure by June 9, 1993. Therefore, the defendant maintains, the "revocation," if there was one, was not "agency," but legislative, conduct. We disagree.

Public Act 93-406, § 2 (b) provides in part that "[a] facility which has initiated the addition of beds but has not obtained licensure of such beds, may . . . apply to the [defendant] for authorization to proceed with completion of the additional beds and application for licensure, provided (A) plans for the additional beds have been approved by the department of health services pursuant to section 19-13-D-8t (v) (4) of the public

[10] See footnote 3.

health code no later than June 1, 1993, and (B) twenty-five per cent of estimated project costs have been expended no later than June 9, 1993, provided project costs may not exceed thirty-one thousand two hundred eleven dollars per bed." Thus, P.A. 93-406 specifically provides that those facilities that had met certain criteria were entitled to "proceed with completion" of the addition. Accordingly, we conclude that P.A. 93-406 did not, ipso facto, revoke the plaintiff's license. Instead, we conclude that this legislation gave to the defendant the authority to determine whether the plaintiff's license should have been revoked based upon its findings as to the specified criteria.

The defendant finally argues that, because it had no discretion to grant or deny the plaintiff's requested expansion if the plaintiff met the statutory criteria, the defendant's permission to continue in the expansion process could not be deemed a license granted by an "agency." There is, however, no authority for the proposition that, because an agency is not accorded discretion to determine whether to grant or deny an application, its conduct in doing so is not agency action within the meaning of the licensure provisions of the UAPA. Indeed, in numerous areas where the legislature has delegated licensing authority to an agency, the legislature has established criteria that, if met, compel the agency to issue a license.[11] In no instance have we held

[11] See, e.g., General Statutes § 20-13 ("[a]ny person who has complied with the provisions of section 20-10 or section 20-12, and who files the proof thereof with the department of public health and addiction services, *shall receive from the department a license,* which shall include a statement that the person named therein is qualified to practice medicine and surgery" [emphasis added]); General Statutes § 20-281c (a) ("[t]he board *shall grant the certificate of 'certified public accountant'* to any person who meets the good character, education, experience and examination requirements of subsections [b] to [d], inclusive, of this section and upon the payment of a fee of seventy-five dollars" [emphasis added]); General Statutes § 20-291 ("[w]hen the applicant has passed such examination to the satisfaction of a majority of the board and has paid to the secretary of said board the fees

that because the legislature has established the criteria for licensure, it is the legislature, rather than the governing agency, that has granted the license.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other justices concurred.

prescribed in section 20-292, *the department of consumer protection shall enroll the applicant's name and address in the roster of licensed architects and issue to him a license,* which shall entitle him to practice as an architect in this state" [emphasis added]).